UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 00-6024-CR-Seitz

UNITED STATES OF AMERICA

v.

HENRY HERNANDEZ

    Defendant.

_____/

## GOVERNMENT'S RESPONSE TO DEFENDANT'S SENTENCING MEMORANDUM

The United States of America respectfully responds to Hernandez's Sentencing Memorandum of Law, in which he discusses the significance of *Blakely v. Washington*, 124 S.Ct. 2531 (2004), for his sentence.

### FACTS AND PROCEDURAL HISTORY

On January 27, 2000, Hernandez was indicted on one count of conspiracy to possess cocaine with the intent to distribute it, in violation of 21 U.S.C. § 846, and one count of possession of cocaine with the intent to distribute it, in violation of 21 U.S.C. § 841. On May 5, 2004, Hernandez pleaded guilty to the substantive count. At the change-of-plea hearing, the Court, following its usual practice, accepted a written statement of facts signed by counsel for the government, counsel for the defense, and the defendant personally, as the factual basis for Hernandez's plea. It is the recollection of the undersigned government attorney that the Court, also following its usual practice, orally inquired of the defendant personally whether the statement of facts was true, and that the defendant confirmed that it was. The statement acknowledged that, if the case had gone to trial, the

government would have proven the following facts beyond a reasonable doubt:

    1.    On January 14, 2000, an individual identifying himself as Elmy Gutierrez, acting on behalf of Metal Distribution Inc., met with a broker and gave him power of attorney to file paperwork necessary to import aluminum ingots into the United States. The defendant accompanied "Gutierrez" to the meeting and signed the power of attorney as a witness.

    2.    On January 19, 2000, United States Customs Service inspectors at Port Everglades, Florida inspected a container of aluminum ingots imported from Colombia. Inspectors discovered one ingot to be hollow and, on further examination, discovered a white powdery substance inside the ingot. The ingot was returned to the cargo for a controlled delivery.

    3.    At approximately 6:20 p.m. on January 20, 2000, a private shipping company, under surveillance by Special Agents with the Drug Enforcement Administration, delivered the container of ingots to the cargo's listed destination, a warehouse in Miami, Florida.

    4.    From approximately 6:53 p.m. through approximately 11 p.m., the defendant; his co-defendant, Oswaldo Delarosa; the defendant's father, Andres Hernandez; and the defendant's brother, Ismael Hernandez, under DEA surveillance, unloaded a total of 18 pallets of aluminum ingots from the container and placed the ingots inside the warehouse.

    5.    The thirteenth pallet unloaded contained the ingot in which Customs inspectors had found the white powdery substance. From approximately 9:36 p.m. to approximately 10 p.m., the four men removed eight ingots from this pallet, then moved the pallet inside the warehouse. The eight ingots that had been removed from the pallet were moved into the warehouse separately. No ingots were removed from the other 17 pallets outside the warehouse.

    6.    At approximately 11:45 a.m. on January 21, 2000, DEA agents entered the warehouse and arrested the defendant and Delarosa inside. In the bay area of the warehouse, agents found five ingots with hollow bottoms that had been cut open. In an office in the building, agents found 35 packages of cocaine.

    7.    After being informed of his *Miranda* rights and agreeing to speak to agents without an attorney present, the defendant stated that he was a day laborer, hired the day before to help unload the container.

    8.    At approximately 3:30 p.m., while being transported to the Federal Detention Center in Miami, the defendant jumped out of the transport vehicle and fled from the vicinity. The defendant remained a fugitive until arrested on April 30, 2002 in New York State for an unrelated offense.

    9.    Subsequent DEA laboratory testing of the 35 packages found in the warehouse revealed that they contained 35.01 kg (net, exclusive of packaging materials) of cocaine hydrochloride, at 46% purity.

Because Hernandez is responsible for 35 kilograms of cocaine, U.S. Probation Officer Paul E. Czekanski's presentence report recommends assigning Hernandez a base offense level of 34,

pursuant to U.S.S.G. § 2D1.1(c)(3) (15-50 kgs). *See* P.S.R. ¶ 22. And because Hernandez fled from custody after his arrest and remained a fugitive for more than two years, the presentence report recommends increasing Hernandez's offense level by two for obstruction of justice, pursuant to U.S.S.G. § 3C1.1. *See* P.S.R. ¶ 26.

## LEGAL ANALYSIS

Hernandez argues that *Blakely v. Washington*, 124 S.Ct. 2531 (2004) requires this Court to assign him a base offense level of 12 and prohibits the Court from increasing his offense level for obstruction of justice. Hernandez reasons (Memo 5-6) that, because the quantity of cocaine involved in his offense was not alleged in the indictment, nor stipulated to in the plea agreement, the court must assign him the base offense level applicable to a minimal quantity of cocaine, namely, level 12. *See* U.S.S.G. § 2D1.1(c)(14). Similarly, he argues (Memo 5-6) that, because the indictment did not allege and he did not stipulate to obstruction of justice, the Court cannot adjust his offense level upward for such obstruction.

In *Apprendi v. New Jersey*, the Supreme Court held, as a matter of constitutional law, that, "[o]ther than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." 530 U.S. 466, 490 (2000). In *Blakely v. Washington*, 124 S.Ct. 2531 (2004), the Supreme Court applied *Apprendi* to invalidate a state-court sentencing enhancement imposed pursuant to Washington's statutory sentencing guidelines regime. The Court found that the sentence violated the Sixth Amendment because

> the "statutory maximum" for *Apprendi* purposes is the maximum sentence a judge may impose *solely on the basis of the facts reflected in the jury verdict or admitted by the defendant*. In other words, the relevant "statutory maximum" is not the maximum sentence a judge may

3

impose after finding additional facts, but the maximum he may impose *without* any additional findings.

124 S.Ct. at 2357 (citations omitted).

I.   **This Court Need Not Consider Whether *Blakely* Applies to the Federal Sentencing Guidelines, Because Hernandez Admitted the Relevant Facts at His Change of Plea Hearing.**

Even if *Blakely* governs sentencing under the federal Sentencing Guidelines, a question discussed below, *Blakely* would not affect the Court's authority to sentence Hernandez as recommended in the presentence report. Thus, the Court need not consider the larger ramifications of *Blakely* for the Guidelines.

As already quoted, the *Blakely* Court held that a court may sentence a defendant based on "*facts . . . admitted by the defendant*." Similarly, in United States v. Marseille, 2004 WL 1627026 (11th Cir. July 21, 2004), the defendant's sentence was enhanced for obstruction of justice and, on appeal, he challenged that enhancement based on *Blakely*. The court of appeals did not decide whether *Blakely* might affect the application of the Guidelines to other defendants, but concluded that *Blakely* was "inapposite" in Marseille's case, because he "admitted to obstructing justice as part of his plea." *Id.* at n. 13. Hernandez admitted that he helped import and unload aluminum ingots, that some of the ingots were broken open after being unloaded, and that DEA agents found 35 kilograms of cocaine in the warehouse where the ingots had been opened. Based on these facts, the presentence report properly concluded that the offense involved 35 kilograms of cocaine. Similarly, Hernandez admitted that, after his arrest, he broke out of DEA custody and remained a fugitive for more than two years. Thus, the presentence report properly concluded that Hernandez had obstructed justice.

Hernandez asserts (Memo 5 n. 3) that his admissions do not satisfy *Blakely* because he did

4

not "agree" or "stipulate" that his relevant conduct encompassed 35 kg of cocaine, nor that his offense level should be enhanced for obstruction of justice. But *Blakely* does not require that a defendant stipulate to particular guidelines calculations, only that those calculations be based on "*facts . . . admitted by the defendant.*" The Court emphasized that the problem was that Blakely's sentence would not have been permissible "on the basis of the facts admitted in the guilty plea." 124 S.Ct. at 2537. In this case, the base offense level and obstruction-of-justice enhancement have been calculated based on "facts admitted in the guilty plea." Hernandez has no *Blakely* claim.

Hernandez also maintains (Memo 5) that offense-level enhancements are permissible only if the relevant enhancements are alleged in the indictment. But he cites no support for that proposition. *Blakely* permits courts to rely on facts "admitted" by the defendant, without suggesting that such facts must also be alleged in the indictment. *Marseille* upheld a federal Guidelines enhancement without considering the indictment at all. If recitation of the relevant facts in the indictment were required, the Eleventh Circuit could not have upheld Marseille's sentence without discussing the indictment in his case.

**II.   *Blakely* Has No Application to the Federal Sentencing Guidelines.**

If the Court holds that Hernandez's admissions would not satisfy *Blakely*, the Court will have to consider whether *Blakely* is applicable to the federal Sentencing Guidelines. The circuit courts that have addressed the question have reached different results. The Fourth and Fifth Circuits have held that *Blakely* does not apply to the Guidelines. See *United States v. Hammoud*, __ F.3d __, 2004 WL 1730309 (4th Cir. Aug. 2, 2004) (en banc); *United States v. Pineiro*, __ F.3d __, 2004 WL 1543170 (5th Cir. July 12, 2004). The Seventh, Eighth, and Ninth Circuits have held that *Blakely* applies to the federal Sentencing Guidelines. See *United States v. Booker*, 2004 WL 1535858, at *1-

5

*6 (7th Cir. July 9, 2004), *cert. granted*, Aug. 2, 2004 (No. 04-104); *United States v. Mooney*, __ F.3d __, 2004 WL 1636960 (8th Cir. July 23, 2004); *United States v. Ameline*, 2004 WL 1635808 (9th Cir. July 21, 2004). A panel of the Sixth Circuit Court of Appeals had found that *Blakely* applies to the Sentencing Guidelines, but that decision was vacated so that the Sixth Circuit could hear the case en banc. The case was then dismissed. *See United States v. Montgomery*, __ F.3d ___, 2004 WL 1562904, at *2-*3 (6th Cir. July 14, 2004), *vacated and rehearing en banc granted* July 19, 2004, *and case dismissed*, 2004 WL 1637660 (July 23, 2004). The Second Circuit has certified the question to the Supreme Court. *See United States v. Penaranda*, 2004 WL 1551369, at *1 (2d Cir. July 12, 2004) (en banc). The United States respectfully submits that this Court should find that *Blakely* does not apply to the Guidelines.

In the first place, the Supreme Court has already upheld the constitutionality of the Guidelines, and those decisions remain binding precedent until overruled. In *Mistretta v. United States*, 488 U.S. 361 (1989), the Court upheld the constitutionality of both the federal Guidelines and the Sentencing Commission. In the face of nondelegation and separation of powers challenges, it held that "Congress neither delegated excessive legislative power [to the Commission] nor upset the constitutionally mandated balance of powers among the coordinate Branches" by placing the Commission within the judicial branch. *Id.* at 384-85, 412. With the overall constitutionality of the Guidelines established, the Court then upheld Guidelines sentences based on judge-found facts neither submitted to nor considered by a jury. In *United States v. Watts*, 519 U.S. 148, 153-54 (1997), the Court upheld an enhancement, under U.S.S.G. § 2D1.1(b)(1), for possession of a gun in connection with a drug offense, even though the jury had acquitted the defendant of the firearms charge under 18 U.S.C. 924(c). The Court noted that U.S.S.G. § 1B1.3—the "relevant conduct"

rule—"directs sentencing courts to consider all other related conduct, whether or not it resulted in a conviction." 519 U.S. at 153-54. Applying that principle, the Court held that the sentencing court could consider the defendant's acquitted conduct (the firearms use) in determining his Guidelines sentencing range (for drug trafficking), so long as the acquitted conduct was proved by a preponderance of the evidence. 519 U.S. at 156-57; *see id.* at 154 ("sentencing enhancements do not punish a defendant for crimes of which he was not convicted, but rather increase his sentence because of the manner in which he committed the crime of conviction"). Similarly, see *Witte v. United States*, 515 U.S. 389, 399-401 (1995) (judge may impose higher Guidelines sentence on defendant convicted of possessing marijuana based on judge's finding that offender also engaged in uncharged cocaine conspiracy); *Edwards v. United States*, 523 U.S. 511, 514-15 (1998) (even if jury convicted defendant of cocaine-only conspiracy, judge may impose higher Guidelines sentence based on finding that defendant's conduct included crack-related activities); *United States v. Dunnigan*, 507 U.S. 87, 95-96 (1993) (court may impose Guidelines enhancement for perjury at trial when sentencing defendant for offense of conviction).

Lower courts are simply "not at liberty to disregard binding case law that is so closely on point and has been only weakened, rather than directly overruled, by the Supreme Court." *United States v. Chubbuck*, 252 F.3d 1300, 1305 n. 7 (11th Cir. 2001); *accord Agostini v. Felton*, 521 U.S. 203, 237 (1997); *Florida League of Prof. Lobbyists, Inc. v. Meggs*, 87 F.3d 457, 461 (11th Cir. 1995). Thus, this Court should not and cannot properly extend *Blakely* to the guidelines.

Moreover, *Blakely* involved two Washington state statutes, one broad and one specific, that set forth various maximum penalties for criminal offenses. That is not how the federal system operates. Congress has only created one set of statutory maxima for federal crimes. The Guidelines

operate within those maxima, *see* U.S.S.G. § 5G1.1, and set forth a host of factors (the current Manual runs some 491 pages) that courts are to consider, both in aggravation and mitigation, in individualizing a particular sentence. These factors correspond to those that judges have always taken into account—such as the manner in which a crime was committed, the nature of the victim, the defendant's role in the offense, whether he obstructed justice at trial, and whether he accepted responsibility for his actions—in fashioning sentences. *Watts*, 519 U.S. at 152.

As the Supreme Court has indicated, the Guidelines were never intended to operate on the same footing as the statutory maximums. Rather, as *Mistretta* made clear, the Guidelines and the Sentencing Commission that promulgates them are constitutionally unique. The Commission is not a legislative body but an "independent commission in the judicial branch of the United States." 28 U.S.C. § 991(a). In formulating the federal Guidelines, "the Commission enjoys significant discretion." *Mistretta*, 488 U.S. at 657. *Mistretta* recognized that the substance of Congress' delegation to the Commission was essentially nonlegislative in character. Like Congress' delegation of rulemaking authority to the judicial branch to prescribe rules of procedure and evidence, *see, e.g.*, 28 U.S.C. § 2072, the delegation to the Commission to make sentencing rules "simply leaves with the Judiciary what long has belonged to it." 488 U.S. at 396. Or, put another way:

> Prior to the [Sentencing Reform] Act, the Judicial Branch, as an aggregate, decided precisely the questions assigned to the Commission: what sentence is appropriate to what criminal conduct under what circumstances. It was the everyday business of judges . . . to evaluate and weigh the various aims of sentencing and to apply those aims to the individual cases that came before them. The Sentencing Commission does no more than this, albeit basically through the methodology of sentencing guidelines, rather than entirely individualized sentencing determinations.

488 U.S. at 395; *id.* at 391 ("Commission's functions . . . are clearly attendant to a central element of the historically acknowledged mission of the Judicial Branch"); *see also United States v. Kinter*, 235

8

F.3d 192, 201 (4th Cir. 2000) ("the Commission's act of establishing sentencing ranges in the Guidelines is categorically different from the legislative act of setting a maximum penalty in a substantive criminal statute"). Indeed, the Court explicitly concluded that the Guidelines do not set statutory maximum sentences in *Edwards*, which it notably cited with approval in *Apprendi*:

> Of course, petitioners' statutory and constitutional claims [that the court must base its Guidelines sentence exclusively on the cocaine-only facts found by the jury] would make a difference if it were possible to argue, say, that the sentences imposed exceeded the maximum that the statutes permit for a cocaine-only conspiracy. That is because a maximum sentence set by statute trumps a higher sentence set forth in the Guidelines.

*Edwards*, 523 U.S. at 515; *Apprendi*, 530 U.S. at 497 n.21; *see also Witte*, 515 U.S. at 399-400 (although Guidelines enhancement for uncharged conduct resulted in higher Guidelines range than otherwise would have applied, range "still falls within the scope of the legislatively authorized penalty" and is thus constitutionally permissible); *Mistretta*, 488 U.S. at 396 (Guidelines "do not . . . establish[] minimum and maximum penalties" for crimes).

      **III.    If this Court Applies *Blakely* to the Guidelines and Concludes That *Blakely* Will Affect Hernandez's Sentence, this Court Should Declare the Guidelines Unconstitutional as Applied and Exercise its Discretion to Impose a Sentence That Mirrors the Guidelines Sentence.**

Hernandez contends that *Blakely* prohibits the Court from making factual findings that increase his sentencing range, but urges the Court to otherwise continue to follow the Guidelines. Thus, Hernandez seeks a sentence far below the sentencing range intended by the Sentencing Commission for Hernandez's conduct. However, if this court concludes that *Blakely* governs the application of the Guidelines and further concludes that Hernandez's admissions at the change of plea hearing are not sufficient to meet the procedural requirements set forth in *Blakely*, this Court should declare the Guidelines unconstitutional as applied, rather than applying them in part. At that

point, the Court would be left to select, at its discretion, a sentence within the statutory sentencing range of 10-20 years.

Congress intended that judges, not juries, apply the Guidelines at sentencing. *See, e.g.*, 28 U.S.C. § 994(a)(1) (directing promulgation of set of guidelines for use of sentencing court); 18 U.S.C. § 3742(d) (requiring courts of appeals to give due deference to district courts' factual findings and credibility determinations in Guidelines appeals); *see also* 18 U.S.C. § 3742(a) (providing government with right of appeal from Guidelines determinations, without considering double-jeopardy issues). Moreover, Guidelines determinations are intended to be made upon proof by a preponderance of the evidence without a requirement of proof beyond a reasonable doubt. *See, e.g.*, U.S.S.G. § 6A1.3, comment.; *see also United States v. Watts*, 519 U.S. 148, 155 (1997) (comparing standards of proof at trial and at sentencing under the Guidelines). And the findings may be based on evidence not admissible in a jury trial. *See* 18 U.S.C. § 3661 ("No limitation shall be placed on the information concerning the background, character, and conduct of a person convicted of an offense which a court of the United States may receive and consider for the purpose of imposing an appropriate sentence."); U.S.S.G. § 6A1.3 (sentencing court in resolving disputed issues "may consider relevant information without regard to its admissibility under the rules of evidence applicable at trial, provided that the information has sufficient indicia of reliability to support its probable accuracy"). If the Court finds these procedural elements of the Guidelines scheme to be unconstitutional, the Court must inquire into the severability of the remaining, substantive, provisions.

The question turns on an assessment of whether Congress would have enacted the provisions that remain constitutional absent the unconstitutional ones. *See Minnesota v. Mille Lacs Band of*

*Chippewa Indians*, 526 U.S. 172, 191 (1999) ("The inquiry into whether a statute is severable is essentially an inquiry into legislative intent."). Thus, the "relevant inquiry in evaluating severability is whether the statute will function in a *manner* consistent with the intent of Congress" after the unconstitutional provisions have been severed. *Alaska Airlines, Inc. v. Brock*, 480 U.S. 678, 685 (1987). The Ninth Circuit has held that the provisions of the Guidelines that are unconstitutional under *Blakely* can be severed from remaining Guideline provisions. *Ameline*, 2004 WL 1635808, at *10-*13. The Eighth Circuit has held the reverse. *Mooney*, 2004 WL 1636960, at *13 ("[T]he Guidelines were designed as an integrated regime, and therefore cannot be severed into constitutional and unconstitutional parts while still remaining true to the legislative purpose.") For the reasons set forth here, the Eighth Circuit was correct.

A system under which Guidelines enhancements (but not reductions) had to be submitted to a jury for determination beyond a reasonable doubt would contravene the clear intent of Congress and the Sentencing Commission. To be sure, a sentencing system that incorporated jury findings on some factual issues with judicial findings on others could be created. But it is not "within the province of the courts to fashion a remedy," *United States v. Jackson*, 390 U.S. 570, 579 (1968), that would depart so dramatically from Congress's intent (and that of the Sentencing Commission) in the unified Sentencing Guidelines as promulgated. Neither Congress nor the Commission has ever made any determination that the sentences that resulted from applying enhancements (but not reductions) only if they were first proven to a jury beyond a reasonable doubt would be just or appropriate sentences for the crimes at issue. They might be too low (because some enhancements simply could not as a practical matter be proven to a jury, because the beyond-a-reasonable-doubt standard is too high, or for other reasons) or they might be too high (because a reviewing court might not be able

11

to overturn a jury verdict on an enhancing fact as easily as it could overturn a judge's finding). But, either way, there is no reason to believe that applying the Guidelines in this way would result in sentences that the Commission (or Congress) believed were appropriate. As the district court recently concluded in *United States v. Croxford*, 2004 WL 1521560 at *10 (D. Utah July 7, 2004) (Cassell, J,), adding a jury overlay to application of Sentencing Guidelines would "effectively require[] the courts to redraft the sentencing statutes and implementing Guidelines."

There would also be severe practical difficulties with a system in which enhancements could be applied only based on jury findings beyond a reasonable doubt, difficulties that neither Congress nor the Sentencing Commission could have intended. Typically, juries have to make a few factual determinations on the limited number of elements of an offense in order to determine whether a defendant is guilty. Those elements have usually been refined through years of judicial decisions, and the instructions given to juries have become standardized. The sudden addition of numerous Guidelines enhancements to the list of facts that juries must decide could dramatically complicate the task of instructing juries and obtaining valid verdicts. A bank robbery case, for example, could require

> a jury to determine factors regarding the nature of the offense [under Guidelines § 2B3.1] such as (1) the nature of the institution robbed; (2) the presence of, brandishing of, or other use of, a firearm; (3) the making of a death threat; (4) the presence of ordinary, serious, or permanent or life threatening bodily injury; (5) any abduction; (6) any physical restraint; (7) the taking of a firearm; (8) the taking of drugs; and (9) the value of property taken; and further factors [under Chapter 3B of the Guidelines] regarding the defendant's role in the offense such as (10) aggravating role; (11) mitigating role; (12) abuse of a position of trust; (13) use of a special skill; and (14) use of a minor; and further factors [under Chapter 3A of the Guidelines] regarding the victim such as (15) hate crime motivation; (16) vulnerable victim; (17) official victim; (18) terroristic motivation; and further factors concerning (19) obstruction of justice [under § 3C1.1]; and (20) acceptance of responsibility [under § 3E1.1]—not to mention another dozen or so grounds for departing upward or downward from the general guidelines calculations.

*Croxford*, 2004 WL 1521560, at * 20. In addition, many of the individual findings required would be difficult for lay juries. To determine a defendant's relevant conduct, a jury would have to find all the acts "aided, abetted, counseled, commanded, induced, procured or willfully caused by the defendant" and, in the case of conspiracy offenses, "all reasonably foreseeable acts and omissions of others in furtherance of the jointly undertaken criminal activity[,]" U.S.S.G. § 1B1.3(a)(1), standards different from those used to convict the defendant of a statutory offense. Because grouping of offenses can increase a defendant's total offense level, juries would have to be instructed regarding the notoriously complex grouping rules. *Id.* §§ 3D1.2-3D1.4. And to determine whether an upward departure was appropriate, the jury would need to consider whether a case involved "an aggravating . . . circumstance of a kind, or to a degree, not adequately taken into consideration by the Sentencing Commission in formulating the guidelines . . . ." 18 U.S.C. 3553(b). But juries are not familiar with all the circumstances taken into consideration by the Sentencing Commission in formulating the Guidelines, and it is difficult to see how a jury could be sensibly instructed regarding those considerations. And if, as Hernandez contends, all enhancements must be included in the indictment as well being presented to the jury, the difficulties would become even more serious. For instance, the obstruction of justice enhancement, U.S.S.G. § 3C1.1, is frequently applied when a defendant testifies falsely at trial or attempts to intimidate witnesses after the indictment is returned — circumstances that could not be included in the indictment.

Therefore, if the Court were to conclude that *Blakely* governs the application of the Sentencing Guidelines and that Hernandez's admissions are not sufficient to satisfy *Blakely*, then the Court should find the Guidelines unconstitutional as applied to Hernandez and return to a system of indeterminate sentencing, in which the Court would exercise its discretion to select a sentence

within the statutory minimum and maximum sentences.

Although the offense involved 35 kilograms of cocaine, Hernandez was indicted before the Supreme Court decided *Apprendi*, as a result of which the weight of the cocaine was not alleged in the indictment. Therefore, the defendant's statutory maximum sentence is 20 years' incarceration, as prescribed by 21 U.S.C. § 841(b)(1)(C), which is applicable to any weight of cocaine. *See United States v. Sanchez*, 269 F.3d 1260, 1278-80 & nn. 51-53 (11th Cir. 2001) (en banc). However, because Hernandez's offense in fact involved more than 5 kilograms of cocaine, he is subject to the 10-year mandatory minimum period of incarceration specified in section 841(b)(1)(A). *See Spero v. United States*, 2004 WL 1516863 (11th Cir. July 8, 2004) (reaffirming in light of *Blakely* that mandatory minimum sentences apply regardless of whether requisite facts are alleged in the indictment or proved to the jury). Hence, this Court would sentence Hernandez to between 10 and 20 years' incarceration. In doing so, it would find whatever facts it believes necessary to impose a sentence within that range. *See Blakely*, 124 S.Ct. at 2540 (noting that, under an indeterminate sentencing scheme, the judge "may implicitly rule on those facts he deems important to the exercise of his sentencing discretion").

In selecting an indeterminate sentence within the statutory range, however, the Court should not simply ignore the Guidelines. Under 18 U.S.C. 3553(b),

> [i]n the absence of an applicable sentencing guideline in the case of an offense other than a petty offense, the court shall . . . have due regard for the relationship of the sentence imposed to sentences prescribed by guidelines applicable to similar offenses and offenders, and to the policy statements of the Sentencing Commission.

Congress accordingly recognized that there would be cases in which the Guidelines would not be directly applicable, and directed that the Court should give "due regard" to the applicable Guidelines

14

provisions and policy statements. That constitutionality of that provision is not called into question by *Blakely*, and there is every reason to believe that Congress would have intended that it remain applicable even in cases in which the Guidelines themselves cannot directly govern the sentence. And aside from the force of any statutory command, "[t]he Sentencing Commission has carefully developed the Guidelines over many years, and the Guidelines generally produce sentences that accord with the public's view of just punishment." *Croxford*, 2004 WL 1521560, at * 15. Accordingly, the Guidelines provide "a valuable source of information, even though they are not binding," *id.*, and sentencing courts should take them into careful consideration in imposing sentence. *See also Mooney*, 2004 WL 1636960, at *12 (adopting *Croxford* analysis).

In this case, for the reasons set forth in the presentence report, the Guidelines require a sentence of more than 20 years' incarceration. Therefore, if the Court adopts an indeterminate sentencing scheme, the Court should sentence Hernandez to the statutory maximum sentence of 20 years.

IV.   **If the Court Concludes That the Guidelines Are Unconstitutional as Applied to Hernandez and That the Unconstitutional Portions of the Guidelines May Be Severed, Hernandez's Total Offense Level Will Be 34, Not 12 or 10.**

Assuming the Court finds that *Blakely* applies to the Guidelines, that Hernandez's admissions at his plea hearing do not satisfy *Blakely*, and that the procedural aspects of the Guidelines can be severed from the substantive ones, the Court would be required to impose a sentence no larger than the maximum sentence permitted by the Guidelines "*on the basis of the facts reflected in the jury verdict or admitted by the defendant.*" Blakely, 124 S.Ct. at 2357. If for some reason Hernandez's admissions do not meet this standard, he is correct that the Court could not enhance his sentence for obstruction of justice. The Guidelines establish a base offense level for controlled-substance offenses

in section 2D1.1, an offense level that, in conjunction with the defendant's criminal history, establishes an upper limit to the defendant's sentencing range. Then, in section 3C1.1, the Guidelines increase that offense level for defendants who obstruct justice, thereby increasing the upper end of the defendant's sentencing range. Thus, under *Blakely*, the section 3C1.1 enhancement would not be permissible if based only on judicial factfinding.

However, Hernandez is wrong to assert (Memo 5-6) that the Court must assign him a base offense level of 12, the level applicable to offenses involving minimal quantities of cocaine. Hernandez contends that any higher offense level would be unconstitutional, because it would require the court to "*adjudicate facts* . . . ." But *Blakely* does not prohibit the Court from adjudicating facts; *Blakely* only prohibits the court from adjudicating facts that increase a defendant's maximum sentence **beyond the maximum sentence that** would have been authorized by the jury's verdict alone. However, section 2D1.1, **the guideline applicable** to controlled-substance offenses, does not assign a base offense level to drug offenses and then increase that level based on the type or weight of drug involved in the offense. Rather, the guideline requires the court to make a drug-quantity finding before any base offense level is established. See U.S.S.G. § 2D1.1(a)(3). The smallest offense level applicable to a defendant sentenced under this guideline is 6, but the court does not *increase* a defendant's offense level from 6 based on the type and weight of the drugs; it would be just as accurate to say that the court begins at level 38 (the largest possible level) and then *decreases* the defendant's offense level based on such findings -- a practice that would be perfectly consistent with *Blakely*. The truth is that the court neither increases or decreases the offense level, but sets the

offense level in the first instance based on such findings.* Hence, "every [drug dealer] knows that he is risking" a base offense level of 38 by violating the Controlled Substances Act. *Blakely*, 124 S.Ct. at 2540. Therefore, no matter how the Court applies *Blakely*, the Court may constitutionally impose a base offense level of at least 34.

V. The Government Recommends That the Court Announce Alternative Sentences.

On August 2, 2004, the Supreme Court granted the United States' petitions for writs of certiorari in two cases involving *Blakely*'s application to the federal Sentencing Guidelines. *United States v. Booker*, S.Ct. Case No. 04-104 and *United States v. Fanfan*, S.Ct. Case No. 04-105. The Court consolidated the cases and set an expedited briefing and oral argument schedule. Because this area of law is unsettled, the government respectfully recommends that this Court announce alternative sentences so that if the Supreme Court ultimately rules differently than this Court, Hernandez's sentence can be corrected without the need for a new sentencing hearing. This is the procedure the Fourth Circuit has ordered all district court judges in that circuit to follow pending

---

* By contrast, the theft and fraud guideline does assign a base offense level for the crime itself, *see* U.S.S.G. § 2B1.1(a), then enhance that offense level based on the amount of the loss, *see id.* § 2B1.1(b).

the Supreme Court's resolution of *Blakely*'s impact on the Guidelines. The Fourth Circuit entered that order on Monday, August 2, 2004, in *United States v. Hammoud*, __ F.3d __ (4th Cir. 2004) (*en banc*).

          Respectfully submitted,

          MARCOS DANIEL JIMENEZ
          UNITED STATES ATTORNEY

By:   */s/ Marc Osborne 8/15/04*
          MARC OSBORNE
          Assistant United States Attorney
          Court ID# A5500796
          99 N.E. 4th Street
          Miami, Florida 33132
          Tel: (305) 961-9198
          Fax: (305) 530-7976

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that I caused a true and correct copy of the foregoing Response to Defendant's Sentencing Memorandum to be mailed first-class on August 16, 2004 to

Martin A. Feigenbaum
150 West Flagler St.
Museum Tower 1565
Miami, FL 33130

Paul Czekanski
U.S. Probation Officer
300 NE 1st Ave, Suite 315
Miami, FL 33132-2126

*Marc Osborne 8/16/04*
MARC OSBORNE
Assistant United States Attorney